ACORN, an unincorporated organization; Julio and Irene Reyes; Suzanne Alexander; Sonya and Fredrick Byers; and Cynthia and Leon Boudreaux; on behalf of themselves and all others similarly situated, Plaintiffs,

v.

HOUSEHOLD INTERNATIONAL, INC.; Household Finance Corporation of California; Beneficial California, Inc., and Does 1 through 50, inclusive, Defendants.

No. C 02–1240 CW.

United States District Court, N.D. California.

June 21, 2002.

Charles Barnhill, William Dixon, Elizabeth J. Eberle, Sarah E. Siskind, Miner

Barnhill & Galland P.C., Madison, WI, Erin C. Day, H. Tim Hoffman, Arthur W. Lazear, Hoffman & Lazear, Oakland, CA, for plaintiffs.

Aaron M. Armstrong, Jonathan P. Hayden, Kerry C. Klein, Anna S. McLean, Jo Ann Hoenninger, Heller Ehrman White & McAuliffe, LLP, San Francisco, CA, for defendants.

ORDER DENYING DEFENDANT HOUSEHOLD INTERNATIONAL'S MOTION TO DISMISS; DENYING DEFENDANTS HOUSEHOLD FINANCE CORPORATION OF CALIFORNIA AND BENEFICIAL CALIFORNIA, INC.'S MOTION TO COMPEL ARBITRATION

WILKEN, District Judge.

Defendant Household International, Inc. (HI) moves to dismiss for lack of personal jurisdiction. Fed. R. Civ. Proc. 12(b)(2). Defendants Household Finance Corporation of California (HFCC) and Beneficial California, Inc. (BCI) move to stay the claims of Plaintiffs Julio and Irene Reyes, Suzanne Alexander, and Sonya and Fredrick Byers and to compel arbitration of these claims. Plaintiffs oppose both motions. The matter was heard on May 24, 2002. Having considered all of the papers filed by the parties and oral argument on the motion, the Court denies Defendant HI's motion to dismiss (Docket # 9) and denies Defendants HFCC and BCI's motion to compel arbitration (Docket # 5).

### BACKGROUND

#### A. Parties

Defendant HI is a Delaware corporation whose principal place of business is Illinois. HI is a holding company that holds stocks in various corporations which provide financial services and products to the general public. Except through the business activities of its subsidiaries, HI does not provide any financial services to the general public. HFCC and BCI are subsidiary corporations of HI. Neither HFCC nor BCI is directly owned by HI. HFCC is owned by Household Finance Corporation while BCI is owned by Beneficial Corporation. Both Household Finance Corporation and Beneficial Corporation are directly owned by HI. HI, through its subsidiaries, operates 1400 lending branches throughout the country. Fifteen percent of its business is in the State of California.

Plaintiff ACORN claims to be the nation's largest community organization of low and moderate-income families. One of the focuses of ACORN's activism is "predatory lending." This lawsuit is part of a larger campaign to stop Defendants from engaging in lending practices ACORN believes to be predatory.

The individual Plaintiffs are all customers of Defendants who consolidated their debt into loans with Defendants in 2000 or 2001.

#### B. Claims

In their complaint, Plaintiffs allege that Defendants engage, jointly and throughout the State of California, in a course of predatory lending to moderate-income homeowners. Plaintiffs claim that Defendants' corporate strategy is to a) target as potential customers homeowners who are struggling with high credit card debt, b) trick them into consolidating their debt into high-cost loans from Defendants, secured against their homes, and c) trap them into their new consolidated loans by "upselling" the loans to amounts so high in relation to the value of the borrowers' homes that the borrowers cannot refinance with Defendants' competitors.

Plaintiffs contend that these practices violate a number of California statutes and constitute common law fraud, deceit, negli-

gent misrepresentation, and unjust enrichment. Plaintiffs seek class-wide damages and equitable relief.

### C. Arbitration Agreements

On the same day that they executed certain loan agreements with Defendants, five of the seven individual Plaintiffs (Plaintiffs Julio and Irene Reyes, Suzanne Alexander, and Sonya and Fredrick Byers) also signed arbitration agreements. These agreements are identical and were written by and included in the loan agreements by Defendants. The relevant portions of these agreements state:

> This Arbitration Rider is signed as part of your Agreement with Lender and is made a part of that Agreement. By signing this Arbitration Rider, you agree that either Lender or you may request that any claim, dispute, or controversy (whether based upon contract; tort, intentional or otherwise; constitution; statute; common law; or equity and whether pre-existing, present or future) including initial claims, counter-claims and third party claims, arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire Agreement (Claim) shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the applicable rules or procedures of the arbitration administrator selected at the time the Claim is filed.

> . . . . .

> This Arbitration Rider is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16(FAA).

> . . . . . .

> No class actions or joinder or consolidation of any Claim with the claim of any other person are permitted in arbitration without the written consent of you and us.

> . . . . .

> No provision of, nor the exercise of any rights under Arbitration Rider shall limit the right of any party during the pendency of any Claim, to seek and use ancillary or preliminary remedies, judicial or otherwise, for the purposes of realizing upon, preserving, protecting or foreclosing upon any property involved in any Claim or subject to the loan documents.

### LEGAL STANDARD

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, defendant may move to dismiss for lack of personal jurisdiction. court may consider evidence presented in affidavits and declaration determining personal jurisdiction. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). Where allegations relevant to personal jurisdiction in the complaint are directly controverted by evidence the court may not assume the truth of the allegations. *Data Disc, v. Systems Technology Assocs.*, 557 F.2d 1280, 1284 (9th Cir. 1977) if the plaintiff brings forward evidence to rebut the defendant's affidavits, such evidence must demonstrate facts that, if true, would support a finding of jurisdiction. *Id.* at 1285. A case should not be dismissed for lack of personal jurisdiction if the plaintiff meets or her burden of making a *prima facie* showing of jurisdiction. *Fields v. Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986); *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir.1995); *see also Myers v. Bennett Law Offices*, 238 F.3d 1068, 1071 (9th Cir.2001) ("Thus, in order to defeat Bennett's motions to dismiss for lack of

personal jurisdiction, at this stage, Plaintiffs only needed to make, through their pleadings and affidavits, a prima facie showing of the jurisdictional facts.").

A federal court's analysis of a challenge for want of personal jurisdiction over a nonresident defendant "turns on two independent considerations: whether an applicable State rule or statute potent confers personal jurisdiction over the defendant, and whether assess of personal jurisdiction accords with constitutional principles of process." *Data Disc*, 557 F.2d at 1286. The California long-arm statute provides that a court may exercise jurisdiction on any basis not inconsistent with the State constitution or the Constitution of the United States. Cal.Code Civ. Proc. § 410.10. The Ninth Circuit consistently found that California's jurisdictional statute is coextensive with federal due process requirements; therefore, jurisdictional inquiries under State law and federal due process standards merge into one analysis. *See e.g., Rano v. Sipa Press*, 987 F.2d 580, 587 (9th Cir.1993); *FDIC v. British–American Ins. Co.*, 828 F.2d 1439, 1441 (9th Cir.1987); *Pacific Atlantic Trading Co. v. M/V Main Exp.*, 758 F.2d 1325, 1327 (9th Cir.1985).

The exercise of jurisdiction over nonresident defendants violate the protections of the due process clause if those defendants do not have "minimum contacts" with the forum State such that the exercise jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law." *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In *World–Wide Volkswagen Corp. v.*

*Woodson*, the Court explained that "the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with forum State are such that he should reasonably anticipate being into court there." 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Jurisdiction has be found to be properly exercised where the contacts proximately result from actions by the defendant that create a substantial connection the forum State. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

The exercise of personal jurisdiction may be either general or specific. General jurisdiction can be asserted when the nonresident activities within a State are substantial or continuous and systematic. If so, the relationship between the defendant and the State is sufficient for the exercise of jurisdiction even if the cause of action is unrelated to the defendant's forum activities. *Data Disc*, 557 at 1287. Specific jurisdiction, on the other hand, is found when cause of action specifically arises out of or relates to the defendant's activities within the forum. *Id.* The Ninth Circuit has held that a claim "arises out of" a defendant's conduct if the claim would not have arisen "but for" the defendant's forum related conduct. *Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).

The Ninth Circuit has articulated a three-part test for specific jurisdiction: (1) the nonresident defendant must do some act or consummate some transaction with the forum or perform some act by it purposefully avails itself of the privilege of conducting activity in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from defendant's forum-related activities, and (3) the exercise of jurisdiction must be reasonable. *Pacific Atlantic Trading Co.*, 758 F.2d at 1327. Each of these conditions is required

for asserting jurisdiction. *Insurance Co. of N. Am. v. Marina Salina Cruz,* 649 F.2d 1266, 1270 (9th Cir.1981).

Specific jurisdiction may be exercised with a lesser showing of minimum contacts than is required for the exercise of general jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–7, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Haisten v. Grass Valley Medical Fund, Ltd.,* 784 F.2d 1392,(9th Cir.1986). There is a presumption that the reasonableness of the specific jurisdiction test is satisfied upon a showing that defendant purposefully directed its activities at forum residents, defendant bears the burden of overcoming the presumption by present a compelling case that specific jurisdiction would be unreasonable*Id.*

The Ninth Circuit has considered seven factors in assessing whether the exercise of jurisdiction over a nonresident defendant is reasonable: (1) the extent of the defendant's purposeful interjection into the forum State's affairs, (2) the burden on the defendant, conflicts of law between the forum and the defendant's home jurisdiction, (4) the forum State's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the dispute the plaintiff's interest in convenient and effective relief, and the existence of an alternative forum. *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir.1991).

## DISCUSSION

### A. Personal Jurisdiction

■ Defendants HFCC and BCI are both wholly owned subsidiaries of Defen-

dant HI. Declaration of Margo J. Hickman (Hickman Dec.) ¶ 14. Except through the activities of its subsidiaries HI has no physical presence in California and conducts no business in California. *Id.* ¶¶ 6–7. It is not disputed, however, that HI's subsidiaries have contacts with the forum State sufficient to establish personal jurisdiction over those subsidiaries in this action. If, therefore, the activities of HFCC and BCI can be imputed to HI, the exercise of jurisdiction over HI would be consistent with the requirements of due process.

A subsidiary's contacts with the forum State can satisfy the minimum contacts test for the parent company if the subsidiary is the "general agent" for the parent in the forum State. *Chan v. Society Expeditions, Inc.,* 39 F.3d 1398, 1405–06 (9th Cir.1994). A subsidiary is a general agent where it performs services beyond " 'mere solicitation' " that " 'are sufficiently important to the [parent] that if it did not have a representative to perform them, the [parent's] own officials would undertake to perform substantially similar services.' " *Id.* at 1405 (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 423 (9th Cir.1977)).[1]

In the present case, Defendant HI is a holding company. It does not itself provide financial services. Rather, it holds stock in companies, such as HFCC and BCI, that provide financial services to the public. Both Plaintiffs and Defendant HI contend that HI's status as a holding com-

---

1. A subsidiary's contacts with the forum State may also establish jurisdiction over its non-resident parent if the subsidiary is acting as the parent's alter ego. *American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996). To establish that a subsidiary is the alter ego of a parent corporation, a plaintiff must show " '(1) that there is

such unity of interest and ownership that the separate personalities of [parent and subsidiary] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.' " *Id.* (quoting *Flynt Distrib. Co. v. Harvey,* 734 F.2d 1389, 1393 (9th Cir.1984)). Plaintiffs do not contend that HFCC and BCI are the alter egos of HI.

pany is dispositive in applying the "general agency" test. Plaintiffs argue that because HI's business is operating subsidiaries, its subsidiaries perform a critical function for HI and should be considered its general agents for jurisdictional purposes. HI, on the other hand, argues that because its business is investment, not financial services, its subsidiaries do not perform a function that it would perform in their absence. Adopting either Plaintiffs' or Defendant HI's approach would result in a per se rule that the actions of a holding company's subsidiary automatically (or never) subject the holding company parent to personal jurisdiction.

In *Chan*, the Ninth Circuit adopted a more nuanced approach. That court rejected the defendant's contention that it was not subject to personal jurisdiction as a matter of law. "We agree that whether [the defendant parent corporation] used [the subsidiary] as its general agent in Washington is a question of fact [and] the record does not contain enough facts to decide the issue on appeal." 39 F.3d at 1406. The court remanded to the district court for further proceedings with instructions to consider, among other factors, what percentage of the parent's business came from the subsidiary, whether the subsidiary was the parent's only agent in the forum and whether the parent, itself, conducted any marketing activities in the forum. *Id.; see also Modesto City Sch. v. Riso Kagaku Corp.*, 157 F.Supp.2d 1128 (E.D.Cal.2001) (listing ten factors to be considered in determining whether a subsidiary is the general agent of the parent); *Arch v. The American Tobacco Co., Inc.*, 984 F.Supp. 830, 837 (E.D.Pa.1997) ("[T]his Court believes that it should examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary to assess whether the contacts of the subsidiary with a particular state should be imputed to the parent.").

Given the necessarily wide-ranging inquiry incident to a determination of general agency, Plaintiffs highlight numerous and varied indicia of the close relationship between HI and its California subsidiaries. Plaintiffs have presented evidence, for example, that a large portion of HI's business comes from the forum State, through the subsidiary defendants. Declaration of Charles Barnhill (Barnhill Dec.), Ex. A (HI's 2001 Annual Report) at 4 ("Consumers residing in the state of California account for 15% of our managed United States receivables.") In addition, HI's corporate officers constitute seventy-five percent of the board of directors of HFCC's direct parent, Household Finance Corporation. *Id.* at 14; Ex. B at 32.

Plaintiffs also contend that HFCC representatives actively sold the services of HI's other subsidiaries to California consumers seeking services with HFCC and that HI directly communicated with HFCC's California customers. Declaration of Irene Reyes (Reyes Dec.) ¶¶ 2–3, Ex. A–F. Plaintiff Reyes, for example, received several letters imprinted with the HI logo. *Id.*, Exs. B–F. One letter, moreover, listed HI's corporate address as the return address. *Id.*, Ex. D. Plaintiff argues that these letters show that HI disregards the corporate form and uses its subsidiaries as conduits for its contacts in the State.

This close relationship between parent and subsidiary is reflected in HI's frequent references to itself and its subsidiaries as a single, unitary enterprise. *Id.*, Ex. A at 3 ("Household and its subsidiaries ... may also be referred to in this Form 10-K as 'we,' 'us' or 'our.'").

Plaintiffs contend that HI is not just structurally intertwined with its subsidiaries, but that it actually exercises control

over its subsidiaries' decision-making process. In support of this contention, Plaintiffs rely, in part, on HI's public role in establishing the lending practices of its subsidiaries. In 2001, representatives of HI participated in discussions with Plaintiff ACORN about reforming HFCC's and BCI's lending practices. Declaration of Lisa Donner (Donner Dec.) ¶¶ 2–3. Subsequent to those discussions, HI submitted to ACORN proposed revisions to the lending policies of its subsidiaries and subsequently disclosed publicly those revisions. *Id.*

In a July, 2001 media advisory, HI referred to itself as a "consumer lender" and outlined several lending policies that it intended to adopt at a cost of approximately $35 million. Barnhill Dec., Ex. E at 1, 2. Similarly, in a February, 2002 media advisory, HI announced a new set of "best practices" in consumer lending that it vowed to implement immediately. Barnhill Dec., Ex. F at 1. The detailed lending policies outlined in the July, 2001 and February, 2002 media advisories are more comprehensive than the general policies typically imposed by a parent. HI, for example, committed all "1400 HFCC and Beneficial branches" to using a "simplified one-page disclosure" on all new real estate loans. *Id.* These documents also suggest that HI dictates the fees charged by its subsidiaries and the specific language of the disclosures provided by its subsidiaries. *Id.* at 1 (HI's best practices include a three percent cap on origination fees and additional verbal disclosures in direct mail and phone solicitations).

Because HI is a holding company that does not actually provide financial services, it appears that HI had the authority and inclination to commit its subsidiaries, HFCC and BCI, to following these policies. In sum, Plaintiffs argue that HFCC and BCI are the general agents of HI for jurisdictional purposes because the overlapping boards, collaborative marketing efforts, and unitary self-image reflect a corporate structure where the parent holding company makes the significant decisions concerning the most basic functions of its subsidiaries.

HI characterizes its relationship with HFCC and BCI as that of a typical parent to its subsidiary and argues that Plaintiffs' evidence is insufficient to establish a principal/agent relationship among the Defendant corporations. HI contends, for example, that the press releases announcing HI's "best practices" in lending are examples of "general policies" that evince a typical parent/subsidiary relationship and do not indicate that HI exercises the level of control necessary to show an agent/principal relationship. *See Kramer Motors, Inc., v. British Leyland, Ltd.*, 628 F.2d 1175 (9th Cir.1980) (parent's control over the internal affairs of the subsidiary probative of whether subsidiary's contacts may be imputed to parent). As Plaintiffs argue, however, these press releases indicate that HI exerts a high level of control over its subsidiaries.

HI also argues that none of the communications sent to California customers of HFCC emanated from HI. Rather, HI contends that the fact that the communications carried the HI logo is insufficient to establish that they were sent by HI. HI contends that even the letter that contains both the HI logo and HI's return address, was not, in fact, sent by HI. Declaration of Mary Johnson ¶¶ 2–6. Although HI contends that it did not directly communicate with its subsidiary's customers, the evidence is susceptible to another interpretation—that HI directly conducted marketing activities in the forum State. *Cf. Chan*, 39 F.3d at 1406 (whether nonresident parent conducted marketing activities in the forum relevant to finding of agency).

Last, HI contends that the fact that it refers to itself and its subsidiaries as a unitary company is irrelevant to the question of agency and should be given no weight. *See Bright v. Primary Source Media,* 1998 WL 671247 at *5 (N.D.Cal. 1998) (reference to the subsidiary as part of the parent corporation not sufficient to establish agency for purposes of jurisdiction). HI similarly argues that overlapping corporate boards are a typical incident of a parent/subsidiary relationship and this fact, therefore, is not probative of whether the subsidiary is the parent's agent. "It is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Doe v. Unocal Corp.,* 248 F.3d 915, 926 (9th Cir.2001) (quoting *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)).

Although it is true that a unitary corporate structure, including the use of overlapping board members, is not alone sufficient to establish agency, several courts have found such overlapping control structures to be probative of a broader principal/agent relationship. *See e.g. Modesto City Sch.,* 157 F.Supp.2d at 1135 (exercising personal jurisdiction where subsidiary's board members were directors of parent corporation); *Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322, 1342 (E.D.N.Y.1981) (existence of overlapping directors and officers is one of many factors relevant to finding of general agency).

Viewing the totality of the circumstances here, the Court concludes that Plaintiffs have established the necessary prima facie case for the exercise of personal jurisdiction over HI based on the contacts of its subsidiaries in the State.

**B. Arbitration**

**1. Motion to Compel**

Section 2 of the Federal Arbitration Act (FAA) provides that "an agreement in writing to submit to arbitration an existing controversy arising out of ... a contract ... shall be valid, irrevocable and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The parties do not dispute that they are signatories to a written arbitration agreement. The issue here "is whether there are grounds 'at law or in equity' for not enforcing" that agreement. *Teledyne, Inc. v. Kone Corp.,* 892 F.2d 1404, 1410 (9th Cir.1989).

In determining whether an agreement to arbitrate is valid, federal courts must "apply ordinary state-law principles that govern the formation of contracts." *Circuit City Stores v. Adams,* 279 F.3d 889, 892 (9th Cir.2002) (quoting *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). "General contract defenses such as fraud, duress or unconscionability, grounded in state contract law, may operate to invalidate arbitration agreements ...." *Id.* (citing *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)); *see also Ticknor v. Choice Hotels Int'l, Inc.,* 265 F.3d 931 (9th Cir. 2001) (applying Montana contract law to determine validity of arbitration agreement). In the absence of a generally applicable State law rendering the agreement to arbitrate invalid, federal courts have "little discretion to deny an arbitration motion, since the Act is phrased in mandatory terms." *Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 475 (9th Cir.1991).

In the present case, Plaintiffs contend that under California law, the arbitration provisions are unenforceable as unconscionable. "Because unconscionability is a de-

fense to contracts generally and does not single out arbitration agreements for special scrutiny, it is also a valid reason not to enforce an arbitration agreement under the FAA." *Circuit City*, 279 F.3d at 895.

## 2. Unconscionability

Under California law, unconscionability has both a procedural and a substantive component.

> The procedural element focuses on two factors: oppression and surprise. Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.

*Ellis v. McKinnon Broad. Co.*, 18 Cal. App.4th 1796, 1803, 23 Cal.Rptr.2d 80 (1993); *see also American Software, Inc. v. Ali*, 46 Cal.App.4th 1386, 1390, 54 Cal. Rptr.2d 477 (1996) ("Indicia of procedural unconscionability include oppression ... and surprise ...") (internal citations omitted). Substantive unconscionability, on the other hand, focuses on "overly harsh" or "one-sided" terms within the contract. *Armendariz v. Found. Health Psychcare Servs.*, 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000) (citing *A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 486–87, 186 Cal.Rptr. 114 (1982)). Although both procedural and substantive unconscionability must be present before a court will refuse to enforce a contract, "they need not be present to the same degree." *Id.* "[T]he more substantively oppressive the contract terms, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

### a) Procedural Unconscionability

■ A contract or clause is procedurally unconscionable if it is a contract of adhesion. *Circuit City*, 279 F.3d at 893 ("The [arbitration agreement] is procedurally unconscionable because it is a contract of adhesion."); *see also Flores v. Transamerica Homefirst, Inc.*, 93 Cal.App.4th 846, 853, 113 Cal.Rptr.2d 376 (2001) ("A finding of a contract of adhesion is essentially a finding of procedural unconscionability."). A contract of adhesion, in turn, is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Armendariz*, 24 Cal.4th at 113, 99 Cal.Rptr.2d 745, 6 P.3d 669 (quoting *Neal v. State Farm Ins. Co.*, 188 Cal.App.2d 690, 694, 10 Cal.Rptr. 781 (1961)).

Defendants do not dispute that the arbitration agreements at issue here meet this definition of a contract of adhesion. Defendants argue, however, that form contracts like the ones here challenged are not adhesive if "the complaining party had reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable." *Dean Witter Reynolds, Inc. v. Superior Court*, 211 Cal. App.3d 758, 768, 259 Cal.Rptr. 789 (1989).

Even if the availability of alternative sources of supply could be, in certain circumstances, probative of the level of procedural oppression incident to the contract, the circumstances in this case do not warrant such a finding.

In *Dean Witter*, in fact, the court specifically held that a claim of procedural unconscionability could not be defeated by "any showing of competition in the marketplace as to the desired goods and services." 211 Cal.App.3d at 772, 259

Cal.Rptr. 789. Rather, in that case, the court specifically noted that the party challenging the fee as unconscionable was "a sophisticated investor" and "the record establishes without conflict that other financial institutions offered competing IRAs which lacked the challenged provision." *Id.* at 771, 259 Cal.Rptr. 789. The evidence in the record here, however, indicates that Defendants market their services to customers "who have limited credit histories, modest income, high debt to income ratios, or have experienced credit problems ...." Barnhill Dec., Ex. A at 5. These consumers are unlikely to refuse one of their few sources of credit because of the inclusion of an arbitration clause.

The circumstances facing the Court here are analogous to those that faced the California Supreme Court in *Armendariz*. In *Armendariz*, the court rejected the contention that the availability of alternative sources of supply affected the procedural unconscionability analysis. The *Armendariz* court found an arbitration clause in an employment agreement to be adhesive and, therefore, procedurally unconscionable. 24 Cal.4th at 114–15, 99 Cal.Rptr.2d 745, 6 P.3d 669. Although the court acknowledged the existence of alternative sources of employment that were not conditioned on the acceptance of an arbitration clause, the court found this fact irrelevant to the procedural unconscionability inquiry.

> [T]he economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment and few employees are in a position to refuse a job because of an arbitration requirement.

*Id.* at 115, 99 Cal.Rptr.2d 745, 6 P.3d 669; *see also Szetela v. Discover Bank,* 97 Cal.

App.4th 1094, 118 Cal.Rptr.2d 862, 867 (2002) (availability of substitute goods not "the relevant test for unconscionability").

The Court therefore rejects Defendants' contention that the availability of competition in the market for consumer loans defeats Plaintiffs' claims that the arbitration agreements were contracts of adhesion. However, an adhesion contract, although satisfying the requirement of procedural unconscionability, may nevertheless be enforceable if the substantive terms are reasonable. *See Craig v. Brown & Root, Inc.,* 84 Cal.App.4th 416, 422–23, 100 Cal. Rptr.2d 818 (2000) (contract of adhesion to arbitrate disputes enforceable).

### b) Substantive Unconscionability

Substantive unconscionability focuses on the harshness and one-sided nature of the substantive terms of the contract. *See A & M Produce,* 135 Cal.App.3d at 486–87, 186 Cal.Rptr. 114. An adhesive agreement to arbitrate will satisfy this general standard for substantive unconscionability if the agreement lacks a "modicum of bilaterality." *Armendariz,* 24 Cal.4th at 117, 99 Cal.Rptr.2d 745, 6 P.3d 669. "Although parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope ... the doctrine of unconscionability limits the extent to which a stronger party may through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself." *Id.* at 118, 99 Cal. Rptr.2d 745, 6 P.3d 669.

■ Whether an arbitration agreement is sufficiently bilateral is determined by an examination of the actual effects of the challenged provisions. *Ellis,* 18 Cal. App.4th at 1803–04, 23 Cal.Rptr.2d 80. ("substantive unconscionability ... refers to an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was

made"). Therefore, an arbitration agreement that is facially neutral nevertheless may be substantively unconscionable. *See Ting v. AT & T*, 182 F.Supp.2d 902, 931 (N.D.Cal.2002) (bilateral ban on class actions "effectively one-sided since it is hard to conceive of a class action suit that [the defendant] would file against its customers"); *id.* at 932 (confidentiality provision applicable to both parties relevant to finding of unconscionability because provision put the defendant, a repeat player in arbitrations, "in a vastly superior legal posture"); *Mercuro v. Superior Court*, 96 Cal. App.4th 167, 179, 116 Cal.Rptr.2d 671 (2002) (arbitration forum, though equally applicable to both parties, relevant to finding of unconscionability because "repeat player effect" rendered provision disadvantageous to weaker party).

 Plaintiffs contend that three provisions of the arbitration agreements render them excessively one-sided and substantively unconscionable. First, Plaintiffs contend that the prohibition on class actions, although facially neutral, in reality benefits Defendants and restricts Plaintiffs' ability to secure any remedy at all. Second, Plaintiffs contend that the requirement that any arbitration award remain confidential works to the benefit of Defendants and the detriment of their customers. Third, Plaintiffs contend that the remedy of foreclosure is specifically excluded from the arbitration provision, to the obvious advantage of Defendants.

Finally, Plaintiffs argue that the cost-splitting provisions of the arbitration agreements are unconscionable as a matter of law.

i. Class Action Provision

In *Szetela v. Discover Bank*, the California Court of Appeal held that a provision of an arbitration agreement that prohibited class actions was substantively unconscionable. The court struck the offending provision from the agreement. 97 Cal. App.4th 1094, 118 Cal.Rptr.2d at 867–68. Recognizing that a provision is substantively unconscionable when it is excessively one-sided, the court held, "The manifest one-sidedness of the no class action provision at issue here is blindingly obvious." *Id.* 97 Cal.App.4th 1094, 118 Cal.Rptr.2d at 867. The court looked beyond the facial neutrality of the provision—which prohibited both the consumer and the credit card company from seeking class status—to the purpose and effect of the provision.

> Although styled as a mutual prohibition on representative or class actions, it is difficult to envision the circumstances under which the provision might negatively impact Discover, because credit card companies typically do not sue their customers in class action lawsuits. This provision is clearly meant to prevent customers ... from seeking redress for relatively small amounts of money.
>
> . . . . . .
>
> The Clause is not only harsh and unfair to Discover customers who might be owed a relatively small sum of money, but it also serves as a disincentive for Discover to avoid the type of conduct that might lead to class action litigation in the first place.
>
> . . . . .
>
> While the advantages to Discover are obvious, such a practice ... provides the customer with no benefit whatsoever; to the contrary, it seriously jeopardizes customers' consumer rights by prohibiting any effective means of litigating Discover's business practices.

*Id.* 97 Cal.App.4th 1094, 118 Cal.Rptr.2d at 867–68.

Defendants argue that *Szetela* is inapposite. In support of this argument, Defen-

dants rely on a distinction between the procedures used by California courts and those used by federal courts when enforcing arbitration agreements. Under California law, a State court may order class-wide arbitration in appropriate circumstances. *See e.g. Keating v. Superior Court*, 31 Cal.3d 584, 611–13, 183 Cal.Rptr. 360, 645 P.2d 1192 (1982) *overruled on other grounds, Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Defendants, citing *McCarthy v. Providential Corp.*, 1994 WL 387852 at *8–9 (N.D.Cal.1994), contend that federal courts may not order class-wide arbitration unless the arbitration agreement specifically allows it.[2]

Defendants contend that this distinction is relevant because, in *Szetela*, the court struck the provision of the agreement prohibiting class-wide arbitration, leaving the agreement silent on the question of whether a class action was permissible. Defendants argue that had this issue arisen in federal court under the FAA, the striking of the "no class action" provision would have had no effect. If the agreement was silent on the question, a federal court would be powerless to order class-wide arbitration. Consequently, Defendants argue that because class-wide arbitration is disfavored in federal court, it could not be unconscionable to prohibit class-wide arbitration in an arbitration agreement whose substantive terms are governed by the FAA.

This subtle argument is ultimately unpersuasive. Defendants have merged the substantive unconscionability analysis with the analysis of the appropriate remedy upon a finding of unconscionability. These questions, however, are analytically dis-

tinct. The first question is whether the contract at issue is unconscionable. This is a question of State law. *Circuit City*, 279 F.3d at 892 ("general contract defenses ... grounded in state contract law may operate to invalidate arbitration agreements"). Upon concluding that a contract is unenforceable under State law, the court must then turn to potential remedies. Because California courts may order class-wide arbitration, the appropriate remedy in State court may be to strike the unconscionable provision and enforce the remainder of the agreement. In doing so, a State court is able to enforce the agreement of the parties to the extent that agreement is not unconscionable. If federal courts are not permitted to order class-wide arbitration, then an alternative remedy must be devised to prevent enforcement of an unconscionable contract. *See e.g. Ting v. AT & T*, 182 F.Supp.2d at 938 (finding arbitration agreement that prohibited class actions unconscionable and enjoining its enforcement)

ii. Confidentiality

The arbitration agreements require "that the award shall be kept confidential." Schneider Dec., Ex. A at 7. Plaintiffs contend that keeping confidential the outcome of all arbitrations favors Defendants and is sufficiently one sided as to be substantively unconscionable.

Defendants make two arguments in opposition to this contention. First, they argue that the confidentiality provisions are irrelevant in an unconscionability analysis because they will have no impact on the adjudication of any individual claim. "The confidentiality provision simply has no bearing on how the arbitrator will ana-

2. The Court notes that Defendants have not cited any binding authority for the proposition that a federal court may not order class-wide arbitration. However, for purposes of

this motion, the Court accepts Defendants' contention. This distinction between State and federal procedures is not material to the issues here in dispute.

lyze the merits of their claims." Reply Brief in Support of Motion to Compel Arbitration at 11. Second, Defendants argue that, to the extent publication of an arbitration award may be desired, the prohibition on such publication is perfectly bilateral, both facially and in effect.

The secrecy provisions of the arbitration agreements both affect the outcomes of individual arbitrations and clearly favor Defendants. They do so by reinforcing the advantages Defendants already possess as repeat participants in the arbitration process. The advantages to repeat participants in the arbitration market are well known and need not be recounted at length here. Suffice it to say that several studies have found and several courts have held that a party's repeated appearance "before the same group of arbitrators conveys distinct advantages over the [one-time participant]." *Mercuro v. Superior Court,* 96 Cal.App.4th at 178, 116 Cal. Rptr.2d 671; *see also* Bingham, "Employment Arbitration: The Repeat Player Effect," 1 Emp. Rts. & Employment Poly. J. 189, 213 (1997) (potential reasons for the repeat player advantage in arbitrations include: "unequal information in arbitrator selection," "unequal representation at the hearing," a repeat participant's ability to screen out and settle meritorious cases, and the arbitrator's incentive to satisfy repeat customers); *Armendariz,* 24 Cal.4th at 115, 99 Cal.Rptr.2d 745, 6 P.3d 669 (size of employee award in arbitration is lower when employer is a repeat participant).[3]

In *Cole v. Burns Int'l Security Servs.,* the court recognized that because of the repeat participant effect, arbitration awards could systematically favor companies over individuals. 105 F.3d 1465, 1476 (D.C.Cir.1997). That court discounted the

likelihood of this occurring, in part, on the grounds that "it is unlikely that such corruption would escape the scrutiny of plaintiffs' lawyers or appointing agencies like the AAA." *Id.* at 1486. By keeping all awards confidential, any advantages that inure to Defendants as repeat participants are effectively concealed, thereby preventing the scrutiny critical to mitigating those advantages. *See e.g. Ting,* 182 F.Supp.2d at 932 ("if consumers obtain determinations that a particular ... practice is unlawful, they are prohibited from alerting other consumers").

Consequently, although facially neutral, the confidentiality provision of the arbitration agreement, in effect, favors Defendants.

### iii. Foreclosure

Pursuant to the arbitration agreement, any "claim, dispute or controversy" between Plaintiffs and Defendants is subject to arbitration. However, during the pendency of such a claim, either of the parties may "seek and use ancillary or preliminary remedies, judicial or otherwise, for the purposes of realizing upon, preserving, protecting or foreclosing upon any property ... subject to the loan documents." Plaintiffs contend that this provision is unconscionable because Defendants have carved out an exception to the broad arbitration provision only for the purpose of foreclosure.

In *Flores v. Transamerica HomeFirst, Inc.,* the California Court of Appeal held substantively unconscionable an arbitration agreement that excluded from its scope the lender's "right to foreclose against the Property." 93 Cal.App.4th 846, 850, 113 Cal.Rptr.2d 376. The court held, "As a practical matter, by reserving

---

**3.** Defendants are repeat participants in that they have, since late 1999 or early 2000, imposed the same arbitration agreement on all of their customers.

to itself the remedy of foreclosure, Home-First has assured the availability of the only remedy it is likely to need.... The clear implication is that HomeFirst has attempted to maximize its advantage by avoiding arbitration of its own claims." *Id.* at 855, 113 Cal.Rptr.2d 376. Plaintiffs contend that this reasoning is equally applicable here and renders the arbitration agreement unconscionable.

Defendants argue that, pursuant to the arbitration agreement, foreclosure, like any other claim, is subject to arbitration. They contend that the disputed clause permits the use of "ancillary or preliminary [judicial] remedies" to maintain the status quo during the course of arbitration. These ancillary and preliminary remedies are equally available to Plaintiffs who may, for example, wish to seek a judicial injunction against a foreclosure initiated by Defendants. Plaintiffs contend that the distinction advanced by Defendants is illusory because it provides an exception to the arbitration agreement with respect to the only remedy Defendants are likely to seek in a dispute with a borrower: foreclosure.

The agreement is reasonably susceptible to both interpretations. As noted above, the arbitration agreements are contracts of adhesion imposed by a sophisticated corporate lender on less financially sophisticated borrowers. In this circumstance, the doctrine of *contra proferentem* dictates that all ambiguities in the agreement be construed against Defendants. Black's Law Dictionary 328 (7th Ed.1999). Therefore, the agreement will be interpreted according to the reasonable interpretation of the borrowers. *See Lawrence v. Walzer & Gabrielson,* 207 Cal.App.3d 1501, 1506, 256 Cal.Rptr. 6 (1989) (ambiguous contract construed in the manner that non-drafting party understood it).

Therefore, the exclusion from the scope of the arbitration agreement of "ancillary or preliminary" judicial remedies for the purpose of foreclosure adds to the one-sidedness and substantive unconscionability of the agreement. This provision weighs in favor of finding the arbitration agreement substantively unconscionable.

iv. Costs

The arbitration agreement contains a provision dividing the costs between the parties. The agreement provides that Defendants will pay the first $100 of any filing fee and that the parties will thereafter split the filing costs "up to the amount charged by the arbitration administrator for a Claim equal to your loan amount." All amounts above this figure must be paid by the borrower. Schneider Dec., Ex. A at 7. In addition, the cost of the actual hearing is divided as follows: "The cost of up to one full day of arbitration hearings will be shared equally between us. Fees for hearings that exceed one day will be paid by the requesting party." *Id.*

In *Circuit City,* the Ninth Circuit held that a requirement in an arbitration agreement that the employee and employer split the arbitrator's fee "would render an arbitration agreement unenforceable." 279 F.3d at 894; *see also Ting,* 182 F.Supp.2d at 934 (costs of arbitration render provision unconscionable because "having to advance such substantial sums will deter many litigants from proceeding"). This holding from the Ninth Circuit relies on the California Supreme Court's decision in *Armendariz.* In that case, the court held:

> [W]e conclude that when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any *type* of expense that the employee would not be required to bear if he or she were free to bring the action in court.

24 Cal.4th at 110, 99 Cal.Rptr.2d 745, 6 P.3d 669 (emphasis in original).

Defendants argue that Plaintiffs' costs of arbitration would not significantly exceed those required in State court. The evidence in the record, however, indicates that the cost of arbitration would be approximately ten times the cost of bringing a similar action in State court. Declaration of Sarah Siskind (Siskind Dec.) ¶¶ 16, 61. Moreover, the *Armendariz* court specifically noted that the party imposing arbitration may not impose any type of cost not incident to a judicial action. Defendants' arbitration agreement transgresses this limitation by imposing on Plaintiffs a share of the entire arbitration cost, including the cost of the arbitrator's fee. Consequently, pursuant to *Armendariz* and *Circuit City*, the cost splitting provision of the arbitration agreement weighs toward finding it unconscionable.[4]

In sum, the arbitration rider at issue here contains numerous one-sided provisions, including the prohibition on class actions, the availability of judicial remedies with respect to foreclosure, the confidentiality provision, and the cost provisions. Taken together, these provisions compel the conclusion that the arbitration agreement is unconscionable under California law and, therefore, unenforceable.

### 3. Severance

 The provisions of the arbitration agreement discussed in this order are all, to varying degrees, one-sided and overly harsh in their effect on Plaintiffs. These provisions, moreover, are interrelated in such a way that the unfairness of the arbitration agreement is magnified. The prohibition on class actions eliminates the

financial incentive to bring a claim, while the cost-splitting provision increases the disincentive to vindicate any alleged violations. The individual plaintiff who is not deterred will find that the confidentiality provision prevents him or her from becoming aware of prior arbitral precedent directly on point, while Defendants suffer no such disability.

The interlocking nature of these hindrances indicates that the purpose of the arbitration agreement is not to transfer claims to a more expeditious forum, but to deter Defendants' customers from bringing claims. As such, the agreement's purpose is "tainted with illegality" and severance is not appropriate. "[I]n order to remove the unconscionable taint from the agreement, ... the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms." *Armendariz*, 24 Cal.4th at 124, 99 Cal.Rptr.2d 745, 6 P.3d 669.

### CONCLUSION

For the foregoing reasons, Defendant Household International's motion to dismiss is denied (Docket # 9) and Defendants Household Finance Corporation of California and Beneficial California Inc.'s motion to stay and compel arbitration of Plaintiffs Reyes, Alexander and Byers' claims is denied (Docket # 5).

The Case Management Conference previously set for July 19, 2002 is vacated. A case management conference shall be held on September 6, 2002 at 1:30 p.m.

---

4. Defendants' effort, in support of their motion, to modify the cost-sharing provision is ineffective. "No existing rule of contract law permits a party to resuscitate a legally defec-

tive contract merely by offering to change it." *Armendariz*, 24 Cal.4th at 125, 99 Cal.Rptr.2d 745, 6 P.3d 669.